**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

|  |  |
|---|---|
| WSOU INVESTMENTS, LLC d/b/a BRAZOS LICENSING AND DEVELOPMENT,<br><br>        Plaintiff,<br><br>    v.<br><br>DELL TECHNOLOGIES INC., DELL INC., AND EMC CORPORATION,<br><br>        Defendants. | Case No. 6:20-cv-00474-ADA<br>Case No. 6:20-cv-00475-ADA<br>Case No. 6:20-cv-00476-ADA<br>Case No. 6:20-cv-00479-ADA<br><br><br><br>**JURY TRIAL DEMANDED** |

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF REGARDING
PATENT NOS. 7,212,536, 7,453,888, 7,565,435 & 8,402,129**

# TABLE OF CONTENTS

**Page**

I.    DISPUTED TERMS FROM THE '536 PATENT................................................. 1

    A.    "bridge" (claims 1, 12)..........................................................................2

    B.    "channel in a connection based network" (claims 1, 12)........................4

    C.    "forwarding system configured to read a priority of a data frame to be forwarded onto the connection-based network by way of the first one of the ports, identify a service interface which the map indicates corresponds to the read user priority and forward the data frame over the channel in the connection-based network associated with the identified service interface" (claim 1)...........................................................................................7

    D.    "means for reading priorities of data frames directed by the bridge to at least a first one of the bridge ports" (claim 12) ......................................9

II.   DISPUTED TERMS FROM THE '888 PATENT......................................... 12

    A.    "stackable trunk port"  (claims 1, 8, 9, 10, 11–13, 15, 19, 20) ............13

    B.    "backbone VLAN trunk" (claims 1, 5, 6, 7, 12, 15–20) ......................15

    C.    "wherein the selection and association of at least one backbone VLAN ID with each one of the corresponding plurality of backbone VLAN trunks is undertaken irrespective of one of an in-use and a stand-by designation of each one of the plurality of backbone VLAN trunks and each one of the plurality of stackable trunk ports" (claim 1) / "wherein the association of the plurality of backbone VLAN IDs with the backbone VLAN trunk is undertaken irrespective of one of an in-use and a stand-by designation of the backbone VLAN trunk and the at least one stackable trunk port" (claim 15) ..................................................................................................18

III.  DISPUTED TERMS FROM THE '435 PATENT......................................... 20

    A.    "setting the IPPC of one of the ports of one of said bridges within the MSTI to a lower IPPC when said port is part of the VLAN member set" (claims 1, 8, 13) .......................................................................................22

    B.    "ideally" (claims 7, 11, and 18) ..........................................................26

    C.    "processing unit for setting the Internal Port Path Cost (IPPC) of one of the ports of one of said bridges within the MSTI to a high IPPC when said port is not part of the VLAN member set" (claim 8) / "processing unit for setting the IPPC of one of the ports of one of said bridges within the MSTI

to a lower IPPC when said port is part of the VLAN member set" (claim 8) ........................................................................................................... 28

    D.     Entirety of claims 9–11 and 13–18 ......................................................... 30

IV.     DISPUTED TERMS FROM THE '129 PATENT ........................................... 33

    A.     "rate of change" (claim 3) ...................................................................... 33

    B.     "initiating a poll of resources in the nodes of the network by the management station in response to reporting from the node or a time interval being exceeded" (claim 3) ......................................................... 38

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
  544 F.3d 1341 (Fed. Cir. 2008)......................................................................15, 38

*Aristocrat Techs., Australia Pty. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008)..............................................................................11

*Avago Techs. Gen. IP (Singapore) Pte Ltd. v. Asustek Computer, Inc.*,
  No. 15-CV-04525-EMC, 2016 WL 3029674 (N.D. Cal. May 27, 2016)...............24

*Bicon, Inc. v. Straumann Co.*,
  441 F.3d 945 (Fed. Cir. 2006)................................................................................26

*Blackboard, Inc. v. Desire2Learn, Inc.*,
  574 F.3d 1371, 91 USPQ2d 1481 (Fed. Cir. 2009) ................................................9

*Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*,
  No. 1:18-CV-760, 2019 WL 2745735 (E.D. Va. July 1, 2019), *aff'd*, 813 F.
  App'x 522 (Fed. Cir. 2020).....................................................................................30

*Cellular Commc'ns Equip. LLC v. HTC Corp.*,
  No. 6:13-CV-507, 2015 WL 1048890 (E.D. Tex. Mar. 9, 2015) ...........................28

*Clear Imaging Rsch., LLC v. Samsung Elecs. Co.*,
  No. 2:19-CV-00326-JRG, 2020 WL 6384731 (E.D. Tex. Oct. 30, 2020)..............27

*Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*,
  899 F.3d 1291 (Fed. Cir. 2018)..............................................................................27

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
  672 F.3d 1270 (Fed. Cir. 2012)..............................................................................26

*Digital Retail Apps, Inc. v. HEB, LP*,
  No. 6-19-00167-ADA,  2020 WL 376664 (W.D. Tex. Jan. 23, 2020)...................34

*Fisher-Rosemount Sys., Inc. v. Invensys Sys., Inc.*,
  No. A-13-CA-587-SS, 2015 WL 1275910 (W.D. Tex. Mar. 19, 2015) .................16

*Function Media, LLC v. Google, Inc.*,
  708 F.3d 1310 (Fed. Cir. 2013)..............................................................................10

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*,
  909 F.2d 1464 (Fed. Cir. 1990)..............................................................................24

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014)..................................................................27

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
430 F.3d 1377 (Fed. Cir. 2005)..................................................................30

*Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*,
302 F.3d 1352 (Fed. Cir. 2002)............................................................14, 17

*Joao Control & Monitoring Sys., LLC v. Protect America, Inc.*,
No. 1-14-cv-134-LY, 2015 WL 4937464 (W.D. Tex. Aug. 18, 2015).....................8

*K-2 Corp. v. Salomon S.A.*,
191 F.3d 1356 (Fed. Cir. 1999)..................................................................31

*KLA-Tencor Corp. v. Xitronix Corp.*,
No. A-08-CA-723-SS, 2011 WL 318123 (W.D. Tex. Jan. 31, 2011) ....................26

*Marine Polymer Techs., Inc. v. HemCon, Inc.*,
672 F.3d 1350 (Fed. Cir. 2012)..................................................................23

*MasterMine Software, Inc. v. Microsoft Corporation*,
874 F.3d 1307 (Fed. Cir. 2017)..................................................................31

*Maxim Integrated Prod., Inc. v. Silicon Mitus Tech., Inc.*,
No. 17-CV-03507 NC, 2018 WL 4657384 (N.D. Cal. July 3, 2018) ....................24

*Mendenhall v. Cedarapids, Inc.*,
5 F.3d 1557 (Fed. Cir. 1993).....................................................................11

*Mformation Techs., Inc. v. Rsch. in Motion Ltd.*,
764 F.3d 1392 (Fed. Cir. 2014)..................................................................23

*Modine Mfg. Co., v. Int'l Trade Comm'n*,
75 F.3d 1545 (Fed. Cir. 1996).....................................................................23

*MTD Prod. Inc. v. Iancu*,
933 F.3d 1336 (Fed. Cir. 2019)..............................................................8, 28

*Neodron, Ltd. v. Dell Technologies, Inc.*,
No. 1-19-00819-ADA, 2019 WL 9633629 (W.D. Tex. Dec. 16, 2019)...............34

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008)..................................................................11

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2013)...........................................4, 5, 7, 15, 17, 20, 32

*Optis Wireless Tech., LLC v. Huawei Device Co.*,
  No. 2:17-CV-123-JRG-RSP, 2018 WL 476054 (E.D. Tex. Jan. 18, 2018)............................28

*Pac. Coast Bldg. Prod., Inc. v. CertainTeed Gypsum, Inc.*,
  816 F. App'x 454 (Fed. Cir. 2020) ....................................................................................26

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)....................................................................................3, 4

*Rembrandt Data Techs., LP v. AOL, LLC*,
  641 F.3d 1331 (Fed. Cir. 2011)........................................................................................30

*Samsung Elecs. Am. v. Prisua Eng'g Corp.*,
  948 F.3d 1342 (Fed. Cir. 2020)........................................................................................28

*SanDisk Corp. v. Kingston Tech. Co.*,
  695 F.3d 1348 (Fed. Cir. 2012)........................................................................................17

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
  511 F.3d 1132 (Fed. Cir. 2007)........................................................................................16

*Skky, Inc. v. MindGeek, s.a.r.l.*,
  859 F.3d 1014 (Fed. Cir. 2017)........................................................................................29

*Southwall Technologies, Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995)....................................................................................35, 36

*Tech. Properties Ltd. LLC v. Huawei Techs. Co.*,
  849 F.3d 1349 (Fed. Cir. 2017)....................................................................18, 19, 35, 36

*TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*,
  920 F.3d 777 (Fed. Cir. 2019)..........................................................................................29

*TMC Fuel Injection System, LLC v. Ford Motor Company*,
  682 F.App'x 895 (Fed. Cir. 2017) ....................................................................................35

*Twin Peaks Software Inc. v. IBM Corp.*,
  690 F. App'x 656 (Fed. Cir. 2017) ....................................................................................12

*UltimatePointer, L.L.C. v. Nintendo Co.*,
  816 F.3d 816 (Fed. Cir. 2016)..........................................................................................31

*Ushijima v. Samsung Elecs. Co., Ltd*,
  No. 1:16-CV-585-LY, 2017 WL 3494229 (W.D. Tex. Aug. 14, 2017)............................14, 16

*Uship Intellectual Properties, LLC v. U.S.*,
  714 F.3d 1311 (Fed. Cir. 2013)........................................................................................35

*V-Formation, Inc. v. Benetton Grp. SpA,*
    401 F.3d 1307 (Fed. Cir. 2005)...................................................................15

*Wi-LAN, Inc. v. Apple, Inc.,*
    811 F.3d 455 (Fed. Cir. 2016).....................................................................22

*Williamson v. Citrix Online, LLC,*
    792 F.3d 1339 (Fed. Cir. 2015)...................................................7, 11, 27, 29

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,*
    442 F.3d 1322 (Fed. Cir. 2006)..............................................................5, 33

*WMS Gaming Inc. v. Int'l Game Tech.,*
    184 F.3d 1339 (Fed. Cir. 1999)...................................................................29

**Other Authorities**

MPEP § 2181(I)(A)..............................................................................................28

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---|---|
| 1 | Internetworking:  A Guide to Network Communications, by Mark A. Miller (1997) (excerpts) ("Miller") |
| 2 | Concise Telecom Networking Dictionary, McGraw-Hill (2000) (excerpts) |
| 3 | TCP/IP and Related Protocols, by Uyless Black (1992) (excerpts) ("Black") |
| 4 | Plaintiff's Infringement Contentions for U.S. Patent No. 7,212,536 (dated October 14, 2020) (excerpt) |
| 5 | Computer Networks, by Andrew S. Tanenbaum (1996) (excerpts) ("Tanenbaum") |
| 6 | Plaintiff's Preliminary Constructions (dated January 20, 2021) |
| 7 | '888 patent File History, 10/19/07 Applicant Argument ("10/19/07 App. Arg.") |
| 8 | '888 patent File History, 6/9/08 Applicant Argument ("6/9/08 App. Arg.") |
| 9 | RS Switch Router User Guide Release 7.0 (excerpt) (annotated) ("Riverstone") |
| 10 | '888 patent File History, 4/8/08 Applicant Argument ("4/8/08 App. Arg.") |
| 11 | '888 patent File History, 1/8/08 Final Rejection ("1/8/08 Final Rej.") |
| 12 | U.S. Patent No. 6,678,241 ("Gai") |
| 13 | MPEP § 2181 |
| 14 | Joint Chart and WSOU's Claim Construction Summaries at Tab 2 |
| 15 | Plaintiff's Infringement Contentions for U.S. Patent No. 8,402,129 (dated October 14, 2020) (excerpt) ("'129 Infringement Contentions") |
| 16 | '129 patent File History, May 2, 2007 Applicant Response ("5/2/07 App. Arg.") |
| 17 | '129 patent File History, Sept. 17, 2007 Applicant Response  ("9/17/07 App. Arg.") |
| 18 | Jan. 27, 2021 Sabanoglu to Loveless Email Subject "WSOU v. Dell et al., Case Nos. 6:20-CV-00473-486; Exchange of Constructions" ("1/27/21 Email") |
| 19 | February 26, 2021 Rosenthal Email Subject: "WSOU v. Dell – 129 patent" ("2/26/21 Email") |

## TABLE OF ABBREVIATIONS

| Abbreviation | Term/Document(s) |
|---|---|
| '129 patent | U.S. Patent No. 8,402,129 |
| '435 patent | U.S. Patent No. 7,565,435 |
| '536 patent | U.S. Patent No. 7,212,536 |
| '888 patent | U.S. Patent No. 7,453,888 |
| Br. | Opening Claim Construction Brief (No. 6:20-cv-474-ADA, Dkt. 82; Case No. 6:20-cv-00475-ADA, Dkt. 85; Case No. 6:20-cv-00476-ADA, Dkt. 74; Case No. 6:20-cv-00479-ADA, Dkt. 81) |
| m-p-f | Means-plus-function |
| MPEP | Manual of Patent Examining Procedure |
| MSTI | Multiple spanning tree instance |
| MSTP | Multiple spanning tree protocol |
| POSA | Person of skill in the art |
| VLAN | Virtual Local Area Network |
| WSOU | WSOU Investments, LLC D/B/A Brazos Licensing and Development |

*Emphasis added unless indicated otherwise.*

Of the 13 technical terms in dispute over the four asserted patents, WSOU offers no guidance for a jury for 12 of them, asserting "plain and ordinary meaning."  In some instances, WSOU apparently agrees with Defendants' constructions but for others provides no guidance as to what the "plain and ordinary meaning" is, instead launching half-hearted attacks on Defendants' construction, by simply calling them "confusing" and "unnecessary."  For the final term, WSOU agrees it must be construed under 35 U.S.C. § 112 ¶ 6 and admits that the structure needs to include an algorithm but then fails to identify what WSOU understands that algorithm to be—because none was disclosed.  By contrast, Defendants' constructions are drawn directly from the intrinsic record and should be adopted.[1]

## I.   DISPUTED TERMS FROM THE '536 PATENT

The '536 patent describes a particular type of network interface device, called a "bridge" that connects to another bridge through established "channels" in a "connection-based network." Figure 3 (annotated below) depicts this arrangement:



FIGURE 3

---

[1] The parties have agreed to divide the total claim term and page limits (as set forth in the Court's Order Governing Proceedings) across the four agreed-upon groups of cases for claim construction (Group 4 (the above-captioned cases), Group 1 (Case Nos. -480, -481, -485, -486), Group 2 (Case Nos. -473, -478), and Group 3 (Case Nos. -477, -482)).

As shown above, for the bridge port **26** within Bridge A, there are multiple different service interfaces **30**. Each of these services interfaces is associated with a different channel **15** through the connection-based network **14**. '536 Patent, 4:54–57. Based on the user priority of an incoming data frame, the bridge assigns the frame to a particular channel in the connection-based network, and thus to its corresponding service interface. *Id.*, 6:22–25. The patent provides examples of mappings that can be used between priorities and channels, depending on the number of established channels available:

TABLE I

ASSIGNMENTS OF PRIORITIES TO CHANNELS FOR
DIFFERENT NUMBERS OF CHANNELS

| | Number of channels | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Priority | | | Connection Used for Priority | | | | | |
| 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 1 | 1 | 1 | 1 | 4 | 4 | 4 | 4 | 4 |
| 2 | 1 | 1 | 1 | 4 | 4 | 4 | 4 | 8 |
| 3 | 1 | 1 | 1 | 1 | 1 | 6 | 6 | 6 |
| 4 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| 5 | 1 | 2 | 2 | 2 | 5 | 5 | 5 | 5 |
| 6 | 1 | 2 | 3 | 3 | 3 | 3 | 3 | 3 |
| 7 | 1 | 2 | 3 | 3 | 3 | 3 | 7 | 7 |

*Id.*, 7:1–17; *see also* Figs. 4, 5A–5I. As shown in the left column above (labeled "1"), if there is only one established channel in the network, all priorities are mapped to the same channel. If instead there are, for example, four established channels in the network, the fourth column (labeled "4") provides the mappings from each of the eight priorities to one of the four available channels.

### A.   "bridge" (claims 1, 12)

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| "a network interface device that operates no higher than the data link layer" | Plain and ordinary meaning |

As the '536 patent explains, the term "bridge" is a technical term that refers to a well-known *specific type* of network interface device. For example, claim 1 recites a "[d]ata handling apparatus . . . comprising: *a bridge*." As such, even in the context of the claims, "bridge" refers to a specific type of device, not just any data handling device. The specification confirms this

understanding, referring to "bridges or similar data handling devices."  *See* '536 patent, 1:7; *see also id.*, 9:17–23 (distinguishing "bridges" from "ethernet LAN service units ('ELSUs')").  As an example, the specification refers specifically to "medium access control (MAC) bridges," which are a well-known type of bridge.  *Id.*, 1:38–40.  WSOU does not allege that applicants ascribed any special meaning to "bridge" in the patent.  Br. 3.  As such, there is no dispute that "bridge" should be given its well-understood meaning to a POSA at the time of the patent.  *See id.* 3–4; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (claim term given "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention").

WSOU does not dispute that the well-understood meaning of a "bridge" at the time of the invention was a network interface device that operates no higher than the data link layer—*i.e.*, a layer-2 network device.[2]  The claims and specification describe a bridge wholly consistent with that well-understood meaning.  The asserted claims recite reading the priority of a "data frame," which is the name of a packet at the data link layer.  *E.g.*, Ex. 1 (Miller), 15.  The specification also uses "data frame."  *E.g.*, '536 patent, 6:15–16.  Similarly, the patent describes the bridge as connecting different "network segments," which is consistent with the traditional role of bridges at the data link layer.  *See id.*, 1:26–27; 2:34–36; 4:26–33; Ex. 1 (Miller), 15.

This well-understood meaning of "bridge" is confirmed by scores of contemporaneous extrinsic sources, including those cited by Defendants.  For example, the Concise Networking Dictionary in 2000 defined bridge as "[a] device that connects two LANs.  ***It performs its functions at the data link control (DLC) layer***."  Ex. 2, 3; *see* Ex. 3 (Black), (stating that a bridge "operates at the data link layer").  This is often depicted as follows:

---

[2] The data link layer is the second layer of the seven-layer OSI model of communications.  Ex. 1 (Miller), 15; *see infra* p. 4.



Figure 1-7. Comparing a Bridge to OSI

Ex. 1 (Miller), 16.  That the bridge operates no higher than the data link layer is the ***defining*** characteristic of a bridge, as opposed to higher-layer devices such as a "router," which operates at the network layer.  *Id.*  Because the bridge operates no higher than the data link layer, it is transparent to all of the higher layers.  This means that the higher layers (such as the Network layer) do not need to know about—or account for—the presence of bridges when providing address information or making routing decisions.  *Id.*

Rather than dispute what bridge means, WSOU instead states that Defendants' construction is "unnecessary" and "confusing."  Br. 3.  To the contrary, the meaning of "bridge" will be critical in this case, since WSOU will doubtless argue that a "bridge" includes devices that no one would consider a bridge in 2001.  *See* '536 patent, cover ("Filed: Dec. 27, 2001").  The lay jury should be instructed as to what the well-understood meaning of "bridge" was at the time of the patent, rather than being permitted to decide that issue for themselves.  And WSOU should not be able to argue otherwise.  *See Phillips*, 415 F.3d  at 1313; *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2013) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.").

**B.   "channel in a connection based network" (claims 1, 12)**

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| "one of the paths that has been established in a network for communications" | Plain and ordinary meaning |

4

Construction of this phrase is necessary to give meaning to both components of the phrase: (1) the channel is "in" a network (the "connection-based network"), as opposed to contained within the bridge; and (2) the channel must be an active channel—*i.e.*, it must be established—in a connection-based network.  Both of these requirements are unambiguously required by the claims and the specification.  Construction is necessary because WSOU apparently intends to argue to the jury that the claims are satisfied by *internal queues* within the bridge itself.[3]  Thus, the Court should rule as a matter of law as to this phrase.  *O2 Micro*, 521 F.3d at 1362.

**First**, the channel must be *in* the connection-based network, as stated in the disputed phrase itself.  The claim states that the channel is "in" the connection-based network.  '536 patent, cls. 1, 12.  And the claims distinguish "a bridge having a plurality of bridge ports" from the channels "in a connection based network" that are "associated with" service interfaces in the ports.  *Id.*  In other words, the claims use different language for the ports and interfaces that are ***within the bridge*** and for the channels that are ***in the network***.  The claims further recite "forward[ing] the data frame over the channel in the connection-based network" (*id.*), which compels the conclusion that the "channel" is outside the claimed device.  WSOU should thus not be permitted to argue that the "channels" phrase refers to something in the bridge itself, as it apparently intends to do.

**Second**, the claim language and specification mandate that the "channels" are "established" in the network.  Claim 1 makes this clear by reciting that service interfaces must be "associated with a channel in a connection-based network," which requires an already-established channel.  Claim 12 similarly requires that the data frames be sent over "service interfaces associated with

---

[3] WSOU relies upon service queues or subinterfaces within a port of the accused device in its infringement contentions.  *See* Ex. 4 at 5; *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1327 (Fed. Cir. 2006) ("Although the construction of the claim is independent of the device charged with infringement, it is convenient for the court to concentrate on those aspects of the claim whose relation to the accused device is in dispute." (quotation omitted)).

active channels"—i.e., those that are established in the network.  Indeed, this is the essence of a "connection-based network," as distinct from a "connectionless" network.  In a connection-based network (like the plain-old telephone system), channels are first established before communications occur.  Ex. 5 at 23 (Tannenbaum); *see also* Ex. 3 at 6–7 (Black).  By contrast, in connectionless networks (like the U.S. mail), each piece of information is separately routed and no channel is pre-established.  *Id.*

The specification is entirely consistent with the well-understood meaning of connection-based networks.  The examples of networks in the specification are all conventional connection-based networks, such as ATM and MPLS.  *Id.*, 1:24–37; 2:38–32 ("The connection based network may comprise an ATM network in which channels are each identified by a connection identifier comprising a VPI [Virtual Path Identifier] and a VCI [Virtual Channel Identifier].").  Moreover, the channels are established in the network—as they must be—prior to use by the bridge.  *See* '536 patent, Fig. 3, 7:19–22 ("Where channels are made available in order, a higher-numbered channel cannot be **established** until all lower-numbered channels have been **established**.").  Indeed, the number of channels available to the bridge depends on how many channels are "active" at a given time—*i.e.*, how many channels have been established.  *Id.*, 6:27–29 ("The mapping used by bridging system 27 for a bridge port 26 will depend upon the number of channels 15 available to the bridge port 26 (e.g. to a number of the service interfaces 30 which **are connected to active channels in network** 14).").  The patent also explains that when one channel fails, the bridge can remap data that was mapped to the failed channel to be assigned to another channel that "remains available." *Id.*, 7:57–8:21.

WSOU has no meaningful opposition to Defendants' construction, instead arguing that it is "confusing and unnecessary."  Br. 4.  WSOU, however, acknowledged in opposing Defendants'

motion to dismiss that this is a claim construction dispute (No. 6:20-cv-474, Dkt. 53 at 5–6); it must be resolved now.  *See O2 Micro*, 521 F.3d at 1362.  WSOU quibbles with the language of Defendants' construction by arguing (for the first time) that the term "paths" is more confusing than "channel" and that it suggests more than one channel must exist.  While WSOU never raised this issue before briefing, it is a non-issue.  Defendants would not object to modifying its construction to be "a channel that has been established in a network for communications."  But it is inescapable that the claim requires an ***established*** channel ***in*** a connection-based network.

C.  **"forwarding system configured to read a priority of a data frame to be forwarded onto the connection-based network by way of the first one of the ports, identify a service interface which the map indicates corresponds to the read user priority and forward the data frame over the channel in the connection-based network associated with the identified service interface" (claim 1)**

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| This term is subject to 35 U.S.C. § 112, ¶ 6. *Function*: read a priority of a data frame to be forwarded onto the connection-based network by way of the first one of the ports, identify a service interface which the map indicates corresponds to the read user priority and forward the data frame over the channel in the connection-based network associated with the identified service interface *Structure*: Indefinite | Plain and ordinary meaning |

The term "forwarding system" is a nonce word with the same effect as "forwarding means," requiring that this term be construed under § 112, ¶ 6.  The inquiry is "whether the words of the claims are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure."  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015).  "Generic terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure' and therefore may invoke § 112, [¶] 6."  *Id*. at 1350.  The word "system" is another one of these nonce terms that has been found not to connote structure, including by this Court.  *See, e.g.*, *Dyfan,*

*LLC v. Target Corp.*, 19-cv-179-ADA, ECF No. 57 at 23–24 (Nov. 25, 2020); *Joao Control & Monitoring Sys., LLC v. Protect America, Inc.*, No. 1-14-cv-134-LY, 2015 WL 4937464, at \*5 (W.D. Tex. Aug. 18, 2015) ("The court finds that system, as used in the claim, functions merely as a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term means for.") (quotation and citation omitted).  Indeed, this Court recently found an almost indistinguishable phrase "forwarding module" to be subject to § 112, ¶ 6.  *Huawei Techs. Co. v. Verizon Comm'n's, Inc. et al.*, 20-cv-00090-ADA, ECF No. 73 at 4 (Nov. 30, 2020).

The term "system" had no readily understandable meaning or structure in the field of computer networking in 2001, nor does WSOU articulate any such structure.  *See* Br. 5–7.  Instead, WSOU block quotes three specification sections, that describe a "bridge" and a "bridging system," and, with no support, argues that "the forwarding system may be a bridge with a bridge port and a bridging system, or a computer processor or a computer-readable medium comprising instructions for a processor (such as those found in Figure 6, *see, e.g., Id.,* 6:15–25)."  Because the specification does not link the claimed forwarding system to a bridge or bridging system, those passages are not relevant to the inquiry.  The Federal Circuit has explained that courts must first determine whether "***the claim limitation*** connotes sufficiently definite structure," and only after concluding it does not, then identify corresponding structure in the specification.  *See MTD Prod. Inc. v. Iancu*, 933 F.3d 1336, 1344 (Fed. Cir. 2019) (applying section 112, ¶ 6 where only the specification—but not the claims—provided sufficient structure).  Here, WSOU does not even attempt to show sufficient structure in the claim itself.

Indeed, the language of claim 1 is ***inconsistent*** with WSOU's attempted correlation to a "bridge with a bridge port and bridging system."  Claim 1 requires a data handling apparatus in which the "bridge having a plurality of bridge ports" is a completely ***separate*** limitation from the

"forwarding system." '536 patent, 9:30–37.  Thus, the one thing the forwarding system **cannot** be is the bridge.  Indeed, WSOU's block quotes reinforce that "system" has no readily understandable structure in the field because there can be many different types of systems and no common or usual structure.  The term "forwarding system" itself is used only a single time in the specification, and simply mimics the language in the claim.  '536 patent, 2:17–25.  And while the specification discloses forwarding in connection with Figure 6, there is **no** disclosure of structure in that description.  *Id.*, 6:15–25.  At most, it is simply a black box which is insufficient to disclose any structure.  *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1383–85, 91 USPQ2d 1481, 1491–93 (Fed. Cir. 2009) (no structure because the specification disclosed no more than a black box).  Because "forwarding system" is a nonce term and does not connote structure, this term is subject to a means-plus-function construction.

There does not appear to be any dispute as to the functions of this term in a § 112, ¶ 6 analysis; Defendants' identification of the functions comes right from the claim language.  However, one of the required functions—"to read a priority of a data frame"—lacks any corresponding structure or algorithm for the same reasons discussed with the next term.  *See, infra* § I.D.  For the same reasons that the "means for reading priorities . . ." term is indefinite, so too is the "forwarding system" term indefinite.

D.  **"means for reading priorities of data frames directed by the bridge to at least a first one of the bridge ports" (claim 12)**

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| This term is subject to 35 U.S.C. § 112, ¶ 6. ***Function***:  reading priorities of data frames directed by the bridge to at least a first one of | Subject to means-plus-function construction. ***Function***:  reading priorities of data frames directed by the bridge to at least a first one of the bridge ports ***Structure***: bridge, with bridging system and bridge port, and equivalents thereof[4] |

---

[4] WSOU changed its proposal in its brief from what it conveyed before briefing.  Previously,

| the bridge ports<br>***Structure***: Indefinite | ***Algorithm, (if required)***: ***see e.g.***. ---, and equivalents thereof. |
| --- | --- |

The parties agree that this term is subject to § 112, ¶ 6 and agree on the identified function.
The only dispute is whether the specification provides corresponding structure for "reading
priorities of data frames . . . ." It does not. The patent ***never*** discloses reading priorities from data
frames, let alone describes any structure for doing so. Indeed, the four block quotes in WSOU's
brief do not even use the word "read" or any equivalent thereof. Br. 7–9.

The closest the patent ever comes to describing this function is in the flowchart of Figure
6, which has a box that simply says "determine priority." '536 patent, Fig. 6. But nothing in the
patent ever states or suggests that Figure 6 is performed by any particular structure. Indeed, the
description of Figure 6 is "a flow chart which illustrates a ***method*** for forwarding data frames
according to one embodiment of the invention." *Id.*, 3:24–26; *see also id.*, 6:15–19 ("FIG. 6
illustrates a ***method*** 100 according to the invention for forwarding a priority tagged data frame. A
frame is received at block 102. In blocks 104 and 106 the priority of the frame ***is determined*** and
the frame is forwarded to a bridge port for delivery to a destination."). Such a flow chart,
disconnected from any structure, is insufficient to connote any structure. *See Function Media,
LLC v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013) (holding that flow charts in the
specification failed to disclose sufficient structure).

More importantly, even if the patent suggested that the method of Figure 6 is to be
performed by a particular structure—which it does not—the method does not describe ***reading*** the
priority of the data frames. Instead, it merely states that the priority of frames "is determined."
*Id.*, 6:15–19. The patent never states how the priority is determined, or even if it is determined

WSOU merely identified "bridge, and equivalents thereof." Ex. 6 (Preliminary Constructions) at
9. WSOU's flip-flopping on this point illustrates that there is no corresponding structure in the
patent that actually performs this function.

from something within the frame itself or in another way. There cannot possibly be a corresponding structure given the complete absence of any description of the claimed function itself. *See id.*; *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1565 (Fed. Cir. 1993) (a specification that does not disclose a function does not support a corresponding means-plus-function limitation).

Because there is no disclosure of the recited function in the specification, WSOU instead relies on disclosure of *other* functions in the claim—*e.g.*, mapping user priorities to service interfaces or assigning frames—presumably arguing that the same structure (bridge) should apply. Br. 7–8. This, of course, is completely beside the point. Whether corresponding structure exists for one claimed function does not affect the lack of corresponding structure for a separately claimed function. *See Williamson*, 792 F.3d at 1352.

WSOU's proposed structure also fails based on the structure of claim 12. Claim 12 recites a "bridge comprising . . ." the "means for reading priorities of data frames . . . ." WSOU proposes that the "means for reading" is *itself* the bridge. Br. 7. That argument is circular and impermissible. The Federal Circuit has squarely rejected such an argument, where a patentee attempted to rely on a claimed apparatus that *itself* included the "means," rather than identify the "component" of the apparatus that performed the recited function. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1366 (Fed. Cir. 2008) (rejecting as "redundant and illogical" the argument that the requisite structure for "generating means" was a "bank computer" when the claim itself recited a "bank computer" that included the "generating means").

Furthermore, for computer-implemented functions, like the "reading priorities" function here, the corresponding structure must further include "the algorithm disclosed in the specification." *Aristocrat Techs., Australia Pty. v. Int'l Game Tech.*, 521 F.3d 1328, 1334 (Fed. Cir. 2008). Even if the same physical structure for other functions were to apply to the function at

issue here, there is certainly no corresponding algorithm.  WSOU string-cites a number of passages, but not a single one of them discloses reading a priority from a data frame, let alone an *algorithm* for doing so.  Br. 9.  As described above, the closest the patent comes is its generic statement that "the priority of the frame is determined," with no explanation of how it is determined.  '536 patent, 6:17–18.  This, of course, does not come close to a required algorithm. The case law is clear that the corresponding structure and algorithm must actually appear in the specification itself.  *See Twin Peaks Software Inc. v. IBM Corp.*, 690 F. App'x 656, 660 (Fed. Cir. 2017) (describing prior cases as "holding that 'a bare statement that known techniques or methods can be used does not disclose structure'" and "noting '[t]he requirement that a particular structure be clearly linked with the claimed function in order to qualify as corresponding structure'").  The lack of any corresponding structure and algorithm here renders this term indefinite.

## II.    DISPUTED TERMS FROM THE '888 PATENT

The '888 patent describes a method of provisioning (setting up) a particular type of VLAN called a backbone VLAN.  *See* '888 patent, 6:10–12.  Applicants explained that "[b]ackbone VLANs travel over backbone VLAN trunks, which are defined between stackable trunk ports on core routers."  Ex. 7, (10/19/07 App. Arg.) at 11–13.  The claimed backbone VLAN is depicted in Figure 3 (annotations added):



FIG. 3

The claimed provisioning methods involve the association of a special-purpose VLAN ID—which is known as a backbone VLAN ID—with stackable trunk ports (302) corresponding to backbone VLAN trunks (308) on core routers (306). *See id.*, 8:61–9:3, 10:18–24. The patent asserts that the purpose of this special backbone VLAN ID (which is used in addition to the standard VLAN ID) is to prevent inadvertent sharing of packets in VLANs where multiple customers use the same standard VLAN IDs. *See id.*, 7:27–33. The claims require that the association of backbone VLAN IDs with stackable trunk ports is done "irrespective of one of an in-use and a stand-by designation"[5] of the backbone VLAN trunks and stackable trunk ports. *Id.*, cl. 1; *see also id.* cl. 15.

A.   **"stackable trunk port"  (claims 1, 8, 9, 10, 11–13, 15, 19, 20)**

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| "trunk port supporting the Riverstone solution (i.e. the | Plain and ordinary meaning |

---

[5] "In-use" and "standby" designations are the result of running a spanning tree protocol. *See, e.g., id.*, 10:9–12, Abstract. Spanning tree protocols provide redundancy in a VLAN by creating a tree of in-use ports/trunks and then assigning redundant ports/trunks as standby. *See id.*, 2:51–55. If an in-use port/trunk becomes unreachable, the spanning tree algorithm reestablishes the connection by activating a standby port/trunk. *See id.*, 2:55–62.

| additional extension 802.1Q packet header)" | |

Applicants expressly defined the term "stackable trunk port" in both the specification and the prosecution history. Defendants' construction mirrors the exact language of these definitions, and should thus be adopted. *See Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1360–61 (Fed. Cir. 2002) ("Where, as here, the patentee has clearly defined a claim term, that definition usually is dispositive; it is the single best guide to the meaning of a disputed term."); *Ushijima v. Samsung Elecs. Co.*, Ltd, No. 1:16-CV-585-LY, 2017 WL 3494229, at *2 (W.D. Tex. Aug. 14, 2017) ("[T]he patentee's lexicography governs.").

The specification states that: "trunk ports supporting the Riverstone solution ***are known as*** stackable trunk ports." '888 patent, 8:24–25. If this clear definition was not enough, applicants confirmed during prosecution that this disclosure shows "***what is meant by***" the term stackable trunk port:

> [T]he description reads "the Riverstone solution brings about a backbone VLAN paradigm wherein: the extended VLAN identifiers are known as backbone VLAN identifiers defining corresponding backbone VLANs, ***trunk ports supporting the Riverstone solution <u>are known as</u> stackable trunk ports*.**" ***These passages clearly illustrate what is meant by*** a backbone VLAN ID and ***stackable trunk ports*** and the Examiner's interpretation of "stackable trunk port" is incorrect.

Ex. 8, (6/9/08 Appl. Arg.) at 11. These passages alone demonstrate that applicants acted as lexicographers and refute WSOU's assertion that the "specification doesn't require the specific elements of Defendants' construction." Br. 10.

The '888 patent further explains that the Riverstone solution is "the additional extension 802.1Q packet header":

> Developments in the field . . . include a ***proposed extension to the IEEE 802.1Q VLAN protocol by Riverstone Networks. The IEEE 802.1Q VLAN protocol extension proposes the use of an additional extension 802.1Q packet header*** . . . . FIG. 2 is a schematic diagram showing exemplary packet structures as specified in the IEEE 802.1Q VLAN protocol and the Riverstone solution, respectively; ***the Riverstone solution enables reuse of standard IEEE 802.1Q VLAN identifiers*** as long as the combined VLAN identification is unique.

14

'888 patent, 5:49–62; *see also id.*, 8:4–5 ("Riverstone stackable VLAN solution provides an extended VLAN identification[.]").  Even WSOU agrees that a stackable trunk port must "support the use of an additional VLAN header."  Br. 10.  WSOU further cites Figure 2 (*see id.*) which shows that the Riverstone solution is an additional extended 802.1Q VLAN header:



'888 patent, Fig. 2 (annotations added); *see also id.*, 5:57–62, 9:4–11.  The Riverstone reference[6] also explains that an additional extended 802.1q header is added to packets traveling through the backbone ports.  Ex. 9 (Riverstone) at 5-18, 5-19.

WSOU's argument that "plain meaning" should apply does not serve the role of explaining highly technical terms to the jury.[7]  *See Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1360 (Fed. Cir. 2008) ("'Claim construction' is for the purpose of explaining and defining terms in the claims . . . .").  Defendants thus respectfully request that "stackable trunk port" be construed, consistent with the applicants' lexicography, to mean a "trunk port supporting the Riverstone solution (i.e. the additional extension 802.1Q packet header)."

**B.    "backbone VLAN trunk" (claims 1, 5, 6, 7, 12, 15–20)**

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| "data transport trunk links defined between stackable trunk ports on core routers" | Plain and ordinary meaning |

---

[6] Riverstone Network's proposed extension to 802.1Q is cited on the face of the patent and is thus intrinsic evidence.  *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) ("[P]rior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence. . . . [W]hen prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term . . . but also that the patentee intended to adopt that meaning.").

[7] And, WSOU admitted that there is a claim construction dispute regarding this term (No. 6:20-cv-00475, Dkt. 54 at 4–6), thus the Court must resolve this issue.  *See O2 Micro*, 521 F.3d at 1362.

As with the prior term, applicants explicitly defined "backbone VLAN trunk" during prosecution:

> Backbone VLANs travel over ***backbone VLAN trunks, which <u>are</u> defined between stackable trunk ports on core routers***. . . . Claim 1 is directed to a method of provisioning a backbone VLAN. . . . ***A backbone VLAN <u>is</u> a path through the core of a network, defined by the switching rules for the stackable trunk ports***, which is able to carry a number of VLANs.  The backbone VLAN uses a field which is in addition to the usual VLAN ID field ***in order that the various core routers through which the backbone VLAN passes are able to switch packets to appropriate stackable trunk ports***.  Gai does not teach backbone VLANs in any way.

Ex. 7, (10/19/07 App. Arg.) at 11–13; *see also* Ex. 10, (4/8/08 App. Arg.) at 11 ("The present invention, as claimed, is directed to a provisioning method which enables a number of possible actual VLANs beyond the usual 4096 limit.  ***Backbone VLANs travel over backbone VLAN trunks, which are defined between stackable trunk ports on core routers***."); *id.* at 12, 14 (same); Ex. 8 (6/9/08 App. Arg.) at 13–14, 16 (same).  Applicants' use of the words "is" and "are" make clear that they were defining backbone VLAN trunks to mean trunk links between stackable trunk ports on core routers.  *See Fisher-Rosemount Sys., Inc. v. Invensys Sys., Inc.*, No. A-13-CA-587-SS, 2015 WL 1275910, at \*11 (W.D. Tex. Mar. 19, 2015) ("Clear definitions are usually set off by quotation marks or are marked by the word 'is.'") (citing *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007)).  Thus, this term should be construed consistent with this lexicography.  *See Ushijima*, 2017 WL 3494229, at \*2.

Contrary to WSOU's assertions (Br. 11), the specification, consistent with the explicit definition above, uniformly mandates that a "backbone VLAN trunk" sits between stackable trunk ports on core routers.  *See* '888 patent, 8:24–27 ("[T]runk ports supporting the Riverstone solution are known as stackable trunk ports and the data transport trunk links associated therewith are known as backbone trunks."); *see also id.*, 8:65–9:11, 10:4–29, 11:20–12:5, 9:12–50, Fig. 3.  WSOU's selective quotation of the specification is misleading and incorrect.  Br. 11.  WSOU cites

a portion of the specification that says "backbone VLAN trunks 308 bridg[e] two managed domains" to suggest that the specification is not limited to backbone VLANs connecting stackable trunk ports.  *See id.* (quoting '888 patent, 11:49–51).  But the ***very next sentence*** states that even in that embodiment, the backbone VLAN trunk is still defined between stackable trunk ports:

> Therefore backbone VLAN trunks 308 bridging two managed domains exist.  ***For such backbone VLAN trunks, the backbone VLAN provisioning methods apply at least to the proximal managed corresponding stackable trunk ports 302***.

'888 patent, 11:49–54; *see id.*, Fig. 3 (reproduced *supra* p. 13) (showing backbone VLAN trunks (308) are defined between stackable trunk ports (302) on core routers (306) in the core network).

In addition, while the patent notes that the definition of core routers is being blurred due to virtualization (*see* Br. 11 (quoting '888 patent, 8:52–57)), the claims require associating "***stackable trunk ports*** corresponding to the plurality of backbone VLAN trunks" and applicants defined the claimed stackable trunk to be "on core routers."  *See* '888 patent, cls. 1, 15; Ex. 7, (10/19/07 App. Arg.) at 11–13; *SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1363 (Fed. Cir. 2012) ("A patentee [] can disclaim [subject matter] by disclosing it in the specification.  As we held . . . , '[w]hen a patent drafter discloses but declines to claim subject matter, . . . this action dedicates that unclaimed subject matter to the public.'" (citation omitted)).  If the term "core router" is ambiguous, as WSOU asserts (Br. 11), then "stackable trunk ports" should be held indefinite.

WSOU cannot be allowed to ignore applicants' clear lexicography in favor of plain meaning.  Plain meaning does not help the jury understand what a backbone VLAN trunk means, especially since the term was expressly defined.  Indeed, WSOU has admitted that there is a claim construction dispute regarding this term (No. 6:20-cv-00475, Dkt. 54 at 4–6), thus the Court must resolve this issue.  *See O2 Micro*, 521 F.3d at 1362.  Defendants respectfully ask the Court to construe "backbone VLAN trunk" to mean "data transport trunk links defined between stackable trunk ports on core routers."  *See Jack Guttman*, 302 F.3d at 1360–61.

**C.** **"wherein the selection and association of at least one backbone VLAN ID with each one of the corresponding plurality of backbone VLAN trunks is undertaken irrespective of one of an in-use and a stand-by designation of each one of the plurality of backbone VLAN trunks and each one of the plurality of stackable trunk ports" (claim 1) / "wherein the association of the plurality of backbone VLAN IDs with the backbone VLAN trunk is undertaken irrespective of one of an in-use and a stand-by designation of the backbone VLAN trunk and the at least one stackable trunk port" (claim 15)**

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| "wherein the provisioning method ignores the designation of a backbone VLAN trunk as in-use or stand-by when associating the backbone VLAN ID with the backbone VLAN trunks (as opposed to, during association of VLANs with trunks, explicitly designating physical VLANs associated with a logical VLAN as in-use and explicitly designating other physical VLANs associated with the logical VLAN as back-up)" | Plain and ordinary meaning |

As with the other '888 patent terms, Defendants' construction for "irrespective" is taken verbatim from applicants' own statements and should be adopted. *See Tech. Properties Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1357 (Fed. Cir. 2017) ("An applicant's statements to the PTO characterizing its invention may give rise to prosecution disclaimer. Prosecution disclaimer can arise from both claim amendments and arguments made to the PTO.").

During prosecution, the examiner rejected the claims as anticipated by U.S. Pat. No. 6,678,241 ("Gai"). Ex. 11 (1/8/08 Final Rej.) at 4–5. The examiner explained that:

> As illustrated in [Gai] Fig. 5C, ***RED logical VLAN*** includes physical VLANs 10-13 . . . . Further, ***each physical VLAN is designated as ACTIVE, STAND-BY, and UNUSABLE***. This implies that the trunks in the physical VLANs associated with each logical VLAN are undertaken ***irrespective*** of a one in-use and/or stand-by designation[].

*Id.*; *see* Ex. 12 (Gai) Fig. 5C (excerpt reproduced below) (annotations added).



In response, applicants distinguished Gai, arguing that the claimed methods must "ignore" spanning tree designations when associating backbone VLAN IDs with backbone VLAN trunks:

> [T]he association of a backbone VLAN ID with a corresponding plurality of backbone VLAN trunks is carried out <u>without any consideration</u> of whether the backbone VLAN trunks are designated as in-use or standby. The backbone VLAN trunks may each already have a designation of in-use or standby, but *the provisioning methods of the present claims[8] ignore those designations when associating the backbone VLAN IDs with the backbone VLAN trunks.*

Ex. 8, (6/9/08 App. Arg.) at 11. Applicants then explicitly disclaimed methods, like the one in Gai, that designate for a particular VLAN ID a single in-use trunk port and designate one or more other ports as backups.

> This is completely *contrary to the backup method taught by Gai,* which during association of VLANs with trunks explicitly designates *one* of the physical VLANs associated with a logical VLAN as *in-use* and explicitly designates *one or more* other physical VLANs associated with the logical VLAN as *back-up*.

*Id.*; *see also* Ex. 7, (10/19/07 App. Arg.) at 11–12 (arguing Gai was "actually contrary to the limitation of claim 1" because Gai "deliberately has *one active* physical VLAN associated with it and a number of stand-by physical VLANs, the association cannot be said to be irrespective of whether the trunk is in-use or stand-by"); Ex. 10, (4/8/07 App. Arg.) at 11–12 (same). These repeated and unequivocal disclaimers made to distinguish painfully close prior art are particularly significant, as applicants admit in the "Background" of the '888 patent that VLAN provisioning, spanning tree protocols, VLAN stacking, and backbone VLAN IDs were all known in the art. *See* '888 patent, 3:45–6:7, Fig. 1–2.

Thus, contrary to WSOU's assertions, the claims require more than just associating all stackable trunk ports (whether in-use or standby) with a VLAN ID. *Compare* Br. 12, *with* Ex. 8, (6/9/08 App. Arg.) at 11. Just as in *Tech. Properties*, applicants here disclaimed this broader

---

[8] The claims at issue were the same claims that were allowed. *See* Ex. 8, (6/9/08 App. Arg.).

reading of this term when they distinguished prior art methods that only allow one in-use backbone VLAN trunk to be assigned to a particular backbone VLAN ID. *See* 849 F.3d at 1358 (affirming disclaimer where applicant argued during prosecution that prior art was "'specifically distinguished from the instant case'" (citation omitted)). As such, the claims cannot read on a system that explicitly designates one port as active and others as backup, as applicants argued.

WSOU's only criticisms of Defendants' construction are that: (1) the words "ignores the designation" are "vague and confusing" and (2) the word "designating" is not in the claims. Br. 12. But these words come *verbatim* from applicants' statements distinguishing the prior art.[9] And, contrary to WSOU's argument, the claims *do* recite "one of an in-use and a stand-by *designation*." '888 patent, cls. 1, 15. Applicants expressly stated that these designations must be *ignored*.

Thus, the "irrespective" limitation should be construed to mean what the applicants said it means, and cannot include methods that only allow one in-use backbone VLAN trunk to be assigned to a particular backbone VLAN ID. Moreover, because WSOU acknowledged this as a claim construction dispute (No. 6:20-cv-00475, Dkt. 53 at 5–6); it must be resolved now. *See O2 Micro*, 521 F.3d at 1362. Defendants respectfully ask the Court to adopt Defendants' construction.

## III.   DISPUTED TERMS FROM THE '435 PATENT

The '435 patent generally describes configuring VLANs in a network managed by a MSTP.[10] *See* '435 patent, 1:8–13. The patent describes a network with a number of VLANs and a number of MSTIs used by those VLANs.[11] *See, e.g., id.*, 1:19–21, 25–27; 3:42–44, 61–63.

---

[9] If the applicants' statements are "vague and confusing," as WSOU asserts (Br. 12), then the "irrespective" term should be held indefinite.

[10] A spanning tree is a linking of nodes across the network with no loops. '435 patent, 3:39–43. The word "multiple" in MSTP is used because there can be several tree structures within the network, each one used for a different group of VLANs. *Id.*, 3:42–44.

[11] An MSTI is a particular spanning tree for a set of VLANs. *Id.*, 3:45–49.

sMore specifically, the patent describes first generating MSTIs and then assigning each VLAN to an appropriate MSTI. *Id.*, Fig. 12. For example, Figures 2A/2B (left) depict MSTIs that are made up of the solid lines (which are active links) and dashed lines (which are inactive links). *Id.*, 3:49–60. Figures 3A/B (right) depict VLANs, where the active links of the VLANs are represented by solid lines and potential alternative links by dashed lines. *See id.*, 3:45–53; 3:63–4:5. MSTI 1 in Figure 2A is appropriate for VLAN 1 in Figure 3A because MSTI 1's active topology fully covers the topology of VLAN 1. MSTI 2 in Figure 2B is not appropriate for VLAN 1 because MSTI 2's active topology does not cover the topology of VLAN 1 entirely. *Id.*, 4:16–20.



FIG. 2A          FIG. 2B          FIG. 3A          FIG. 3B

Figure 4A (below) shows MSTI 1 and VLAN 1 superimposed. In Figure 4A, the solid lines are active links, the dashed line is part of the MSTI *and* part of the VLAN but currently inactive, and the bold line is part of the MSTI but *not* part of the VLAN. According to the patent, when a link failure occurs in the MSTI, the MSTP will have to activate another link. *See id.*, 1:28–35. For example, if a link failure occurs between Bridges B and C in Figure 4A, the MSTI could activate either the bolded link between Bridges A and C (which is not preferred) or the dashed link between Bridges B and D (which is preferred). To ensure the newly activated link is both within the MSTI *and* within the VLAN (*i.e.*, the dashed link between B and D), the patent discloses setting the path costs (IPPC) of ports that are *within* the MSTI but *not within* the VLAN to a higher cost, and setting the costs of ports that are *within* the MSTI *and within* the VLAN to a lower cost. *See, e.g.*, *id.*, 5:9–33. Thus, as shown in Figure 6 (below), when a link fails, the network will favor lower-cost ports, and thus attempt to activate a path within the MSTI *and* within the VLAN (the

path between B and D in Figure 6).  *See id.*



FIG. 4A          FIG. 6

**A.    "setting the IPPC of one of the ports of one of said bridges within the MSTI to a lower IPPC when said port is part of the VLAN member set" (claims 1, 8, 13)**

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| order of steps<br>The setting of the IPPC to a lower IPPC must occur after the creation and configuration of the Multiple Spanning Tree Instances step and after the creation of the VLAN member sets step | Plain and ordinary meaning |

All of the asserted claims require creating the MSTIs and associating VLAN member sets with those MSTIs ***before*** setting port costs.  For example, claim 1[12] of the '435 patent recites:[13]

**1[pre]**    A method … comprising the steps of

**1[a]**    *creating and configuring a plurality of Multiple Spanning Tree Instances (MSTIs)* whose active topology covers the topology of Virtual Local Area Networks (VLANs) being used within the computer network;

**1[b]**    *creating VLAN member sets and associating each of said VLANs with an appropriate one of the MSTIs*, each of said VLAN member sets indicating the ports in each of the bridges within one of the MSTIs to which data traffic destined to members of the associated VLAN is being forwarded;

**1[c]**    setting the Internal Port Path Cost (IPPC) of one of the ports of one of said bridges *within the MSTI* to a high IPPC when said port is *not part of the VLAN member set*; and

**1[d]**    setting the IPPC of one of the ports of one of said bridges *within the MSTI* to a lower IPPC when said port is part of *the VLAN member set* … .

The plain language of this claim requires that the disputed limitation—1[d]—must occur

---

[12]  Claim 8 is a "bridge" claim and claim 13 is a "computer network" claim.  Both claims recite similar limitations as set forth in claim 1.

[13]  Bracketed notations ("[a]," "[b]," etc.) were added to facilitate identification of each limitation.

*after* limitations 1[a] and 1[b].[14]  *See, e.g., Wi-LAN, Inc. v. Apple, Inc.*, 811 F.3d 455, 460 (Fed. Cir. 2016) (claims have an "ordering requirement" when steps refer back to results of previous steps).  Here "the MSTI" and "the VLAN member set" in limitation 1[d] refer back respectively to the "creating and configuring … MSTIs" in step 1[a] and "creating VLAN member sets" in step 1[b].  It is further axiomatic that "creating" needs to occur before it could be determined whether something is "*within* the MSTI" or "*part of* the VLAN member set" as required by step 1[d].

In addition to the unequivocal language of the claims, which is dispositive by itself, every embodiment discussed in the specification requires limitation 1[d] to be performed *after* limitations 1[a] and 1[b], which further confirms the order required by the claim.  *See Mformation Techs., Inc. v. Rsch. in Motion Ltd.*, 764 F.3d 1392, 1400 (Fed. Cir. 2014) (noting order of steps "is consistent with the sole embodiment in the specification").  Limitation 1[d], which is described as the "first feature of *the present invention*," is explicitly performed only *after* limitations 1[a] and 1[b] are completed.  *See, e.g., Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1359 (Fed. Cir. 2012) (holding use of "the present invention" limits the claims); *Modine Mfg. Co., v. Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (Fed. Cir. 1996) ("[W]hen the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment.").  The specification discusses creating MSTIs (*see* '435 patent at 3:29–60; 6:10–6:36), and creating VLAN member sets and associating each of said VLANs with one of the MSTIs.  *See id.*, 4:6–5:5; 6:37–7:9.  The specification then states:

> *After* the VLAN member sets are created *and* the VLANs are mapped onto and associated with an appropriate MSTI, *then the first feature of the present invention* is performed [discussing limitations 1[c] and 1[d]].

---

[14] The same reasoning mandates that limitation 1[c] must follow 1[a] and 1[b], but Defendants chose to focus only on 1[d] given claim construction term limits.

*See id.*, 5:6–50; 7:10–12 (same).  Thus, the specification confirms the order required by the plain language of the claims.

WSOU does not dispute that limitation 1[d] must occur after limitations 1[a] and 1[b] begin.[15]  WSOU instead argues that 1[d] can be performed before steps 1[a] and 1[b] are finished.  Br. at 14.  WSOU's argument selectively isolates words in the claim and ignores the remainder of the claim language.  WSOU highlights "a plurality" in limitation 1[a] and "one of the [MSTIs]" in limitation 1[b] to conclude that "nothing in the claim language" prevents limitation 1[d] from being performed before limitations 1[a] and 1[b] are completed.  *Id*.  That argument ignores that limitation 1[b] requires "associating each of said VLANs with an ***appropriate one*** of the MSTIs"—that plain language requires limitation 1[a] to be completed before 1[b].  Moreover, as discussed above, WSOU further ignores that the specification specifically describes limitation 1[d] as being performed after limitations 1[a] and 1[b] are complete.

WSOU is also incorrect in its position that applying an order to claims 8 and 13 "makes no sense."  Br. at 13–14.  The law is clear: apparatus and system claims can have an order of steps when they are similar to the method claim.  *See Avago Techs. Gen. IP (Singapore) Pte Ltd. v. Asustek Computer, Inc.*, No. 15-CV-04525-EMC, 2016 WL 3029674, at *12 (N.D. Cal. May 27, 2016) (noting case law supporting, and absence of any case law refuting, that "order can be required by a system/apparatus claim"); *Maxim Integrated Prod., Inc. v. Silicon Mitus Tech., Inc.*, No. 17-CV-03507 NC, 2018 WL 4657384, at *9 (N.D. Cal. July 3, 2018) (collecting cases).[16]

---

[15] At a minimum the Court should thus require that steps 1[a] and 1[b] must begin before step 1[d].

[16] WSOU fails to address this case law; its sole case cite is irrelevant as it does not address whether an apparatus claim can include an order of steps.  *See Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990) (discussing whether prior art covers apparatus claim).

Here, claims 8 and 13 contain virtually identical limitations as limitations 1[a], 1[b], and 1[d], and most importantly contain ***exactly the same referential language*** back to prior steps:

| Claim 1 | Claim 8 | Claim 13 |
|---|---|---|
| **1[a]**  *creating and configuring a plurality of Multiple Spanning Tree Instances (MSTIs)*  whose active topology covers the topology of Virtual Local Area Networks (VLANs) being used within the computer network; | a Multiple Spanning Tree Protocol (MSTP) engine used for *creating and configuring a plurality of Multiple Spanning Tree Instances (MSTIs)* whose active topology covers the topology of the plurality of VLANs within the computer network; | *creating and configuring a plurality of Multiple Spanning Tree Instances (MSTIs)* whose active topology covers the topology of Virtual Local Area Networks (VLANs) being used within the computer network; |
| **1[b]** *creating VLAN member sets* and *associating each of said VLANs with an appropriate one of the MSTIs*, each of said VLAN member sets indicating the ports in each of the bridges within one of the MSTIs to which data traffic destined to members of the associated VLAN is being forwarded; | a processing unit for *creating VLAN member sets* and *associating each of said VLANs with an appropriate one of the MSTIs*, each of said VLAN member sets indicating the ports in each of the bridges within one of the MSTIs to which data traffic destined to members of the associated VLAN is being forwarded; | *creating VLAN member sets* and *associating each of said VLANs with an appropriate one of the MSTIs*, each of said VLAN member sets indicating the ports in each of the bridges within one of the MSTIs to which data traffic destined to members of the associated VLAN is being forwarded; |
| **1[d]**  setting the IPPC of one of the ports of one of said bridges *within the MSTI* to a lower IPPC when said port is part of *the VLAN member set*; | said processing unit for setting the IPPC of one of the ports of one of said bridges *within the MSTI* to a lower IPPC when said port is part of *the VLAN member set*; | setting the IPPC of one of the ports of one of said bridges *within the MSTI* to a lower IPPC when said port is part of a [sic] *the VLAN member set*; |

Since claims 8 and 13 recite a substantively identical limitation to 1[d], which requires the creation of MSTIs and association of VLAN member sets, both require the same order of steps as claim 1.

## B.    "ideally" (claims 7, 11, and 18)

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| Indefinite | Plain and ordinary meaning |

The term "ideally," as used in the claims, does not provide reasonable certainty as to when infringement occurs.  Claims 7, 11 and 18 recite "said high IPPC is a value that is ***ideally*** between the highest value allowed by an encoding and the highest IEEE standard recommended value." Based on the plain language of the claim, there is absolutely no way to determine the meaning of this limitation.  By itself, "ideally" provides no objective indicia about whether the value must be ***near*** the range of possible values and if near, ***how close*** must a value be to meet the scope of

"ideally."  The claims and specification also do not provide any guidance about when a value is close enough to be "ideally."  *KLA-Tencor Corp. v. Xitronix Corp.*, No. A-08-CA-723-SS, 2011 WL 318123, at *5 (W.D. Tex. Jan. 31, 2011) (claims indefinite because "patent fail[ed] to identify" when line is "close enough to be substantially maximizing").

On the other hand, "ideally" could arguably mean one of two totally opposite things: "required to be," or "not required to be."  Both interpretations are contrary to well-established rules of claim construction.  And in any event, there is no way to tell which of these two constructions applies.

Interpreting "ideally" to mean either "required" or "not required" would make parts of the claim superfluous.  For example, in *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012), the Federal Circuit rejected a construction that rendered claim language superfluous because it was "contrary to the well-established rule that 'claims are interpreted with an eye toward giving effect to all terms in the claim.'" (quoting *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006)).  Here, if "ideally" meant "required," that would render the word "ideally" superfluous.  And if "ideally" meant "not required," that would render the entire claim limitation in which it appears a nullity.  Neither interpretation can be right.

Even if any of the preceding interpretations worked, there is no way to tell which applies. In *Pac. Coast Bldg. Prod., Inc. v. CertainTeed Gypsum, Inc.*, 816 F. App'x 454, 457–59 (Fed. Cir. 2020), the court found a term indefinite where "the plain language of the claim and specification did not" provide guidance as to its meaning among more than one potential meaning.  Here, the plain language of the claims and the specification provides no guidance as to whether "ideally" means required or not required.  *See* '435 patent, 5:15–22 (using "ideally" as used in the claims); 8:33–38 (using "ideally" to describe how a network administrator can set path cost values).

WSOU argues that "ideally" provides "an objective indication for what the high IPPC value should be set to." Br. 15. But WSOU does not explain what that "objective indication" is and instead, simply reiterates the claim. *Id.* If WSOU means that "ideally" means the value *must* be set in the recited range, WSOU has rendered the term "ideally" superfluous. If instead, WSOU means that "ideally" does not have to be set in that range, the entire limitation is meaningless. Since there is no clear meaning, the term is indefinite. *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) ("[A]term of degree fails to provide sufficient notice of its scope if it depends on the unpredictable vagaries of any one person's opinion.") (quotations omitted); *Clear Imaging Rsch., LLC v. Samsung Elecs. Co.*, No. 2:19-CV-00326-JRG, 2020 WL 6384731, at *20 (E.D. Tex. Oct. 30, 2020) (finding "substantially blur free" indefinite).

C.   **"processing unit for setting the Internal Port Path Cost (IPPC) of one of the ports of one of said bridges within the MSTI to a high IPPC when said port is not part of the VLAN member set" (claim 8) / "processing unit for setting the IPPC of one of the ports of one of said bridges within the MSTI to a lower IPPC when said port is part of the VLAN member set" (claim 8)**

| Defendants' Proposal[17] | WSOU's Proposal |
|---|---|
| This is subject to 35 U.S.C. § 112, ¶ 6.<br>***Function***: setting the Internal Port Path Cost (IPPC) of one of the ports of one of said bridges within the MSTI [to a high IPPC when said port is not part of the VLAN member set / to a lower IPPC when said port is part of the VLAN member set]<br>***Structure***: Indefinite | Plain and ordinary meaning |

"Processing unit" does not connote sufficiently definite structure, thus, this term is subject to § 112, ¶ 6. Even if a claim does not use the word "means," § 112, ¶ 6 applies if the term fails to "recite sufficiently definite structure" or recites "function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1349. Here, the claim language does not impart any structure for "processing unit." Instead, the claim describes a "processing unit" by

---

[17] WSOU listed the wrong construction under Defendants' proposal. *Compare* Br. 4, *with id*. 15.

solely describing its function: setting the path costs of ports. *Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1298 (Fed. Cir. 2018) ("cheque standby unit" invoked § 112, ¶ 6 because the claims described the term "solely in relation to its function and location in the apparatus").

The term "processing unit" is a nonce word, equivalent to a generic black box. The MPEP § 2181(I)(A), recognizes "unit" as a non-structural generic placeholder. Ex. 13 (MPEP) at 2. Adding a generic prefix such as "processing" to "unit" does not transform "unit" into having "sufficiently definite structure." *See Optis Wireless Tech., LLC v. Huawei Device Co.*, No. 2:17-CV-123-JRG-RSP, 2018 WL 476054, at *32 (E.D. Tex. Jan. 18, 2018) ("processing unit" invoked § 112(6)); *Cellular Commc'ns Equip. LLC v. HTC Corp.*, No. 6:13-CV-507, 2015 WL 1048890, at *12 (E.D. Tex. Mar. 9, 2015) ("designating unit" invokes § 112(6)).

Contrary to WSOU's argument, the claim does not provide sufficient structure for "processing unit." Tellingly, WSOU does not point to any language in the claim for structure and only argues that the *specification* provides structure. *See* Br. 16 (alleging only that structure exists in the specification). WSOU's argument, however, conflates the two-step m-p-f limitation inquiry. The first step considers "whether the *claim limitation* connotes 'sufficiently definite structure'" and if so, then the second step "review[s] the specification to identify the structure that performs the claimed function(s)." *MTD Prod. Inc. v. Iancu*, 933 F.3d 1336, 1344 (Fed. Cir. 2019). The Federal Circuit criticized the PTAB for "conflat[ing] these distinct inquiries." *Id*. Holding otherwise, would "leave § 112, ¶ 6 without any application: any [m-p-f] limitation that met the statutory requirements, *i.e.*, which includes having corresponding structure in the specification, would end up not being a [m-p-f] limitation at all." *Id*. Thus, WSOU's reliance on the *specification* to impart structure on the *claim* at step one of the m-p-f inquiry is misplaced. WSOU's inability to describe any structure in the claim is revealing—there is none.

29

WSOU's cited cases are inapposite. In *Samsung Elecs. Am. v. Prisua Eng'g Corp.*, the party seeking to invoke § 112, ¶ 6 *admitted* that the claimed "digital processing unit" had structure. 948 F.3d 1342, 1353 (Fed. Cir. 2020). In *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, the claim language alone had sufficient structure by reciting "the container, the compressor assembly, and the inflatable article." 920 F.3d 777, 785 (Fed. Cir. 2019). In *Skky, Inc. v. MindGeek, s.a.r.l.*, the disputed term contained "means" and because the claim did not recite function but "instead denote[d] structure," the presumption against § 112, ¶ 6 had been overcome. 859 F.3d 1014, 1020 (Fed. Cir. 2017). This is not the situation here.

Under § 112, ¶ 6, the claim is indefinite because there is no structure whatsoever in the specification that corresponds to the recited function. Indeed, WSOU does not even attempt to articulate what, if any, structure exists if the term is subject to § 112, ¶ 6. *See* Br. 15–16. To the extent WSOU argues that a "processor within a bridge device" is sufficient structure (Br. at 16), it is not. Under § 112, ¶ 6, "the structure disclosed in the specification must be more than simply a general purpose computer or microprocessor." *Williamson*, 792 F.3d at 1352. For a general purpose processor, it must include an algorithm for performing the function. *See WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999); *Dyfan,* 2020 WL 8617821, at *7. Here, there is no algorithm disclosed in the specification for setting port costs; WSOU does not argue otherwise. Br. 16. Since the patent does not disclose any structure corresponding to the recited function, the term "processing unit" is indefinite.

### D.    Entirety of claims 9–11 and 13–18

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| Indefinite | Plain and ordinary meaning |

Each of claims 9–11 and 13–18 recite a method step within non-method claims.[18]  Thus, these claims are indefinite under *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1383–84 (Fed. Cir. 2005).  For instance, in *Rembrandt Data Techs., LP v. AOL, LLC*, the Federal Circuit held that a claim to "a data transmitting device" that included a method step "transmitting the trellis encoded frames" was invalid under *IPXL* because the claim recited both apparatus and method steps.  641 F.3d 1331, 1339–40 (Fed. Cir. 2011).  The same logic applies here.

*Claims 9 and 16, 10 and 17, 11 and 18*:  Each of these claims depends on an apparatus claim (either independent claim 8 or 13) but requires the actual performance of a step.  Dependent claims 9 and 16 require that the bridge of the independent claim "*operates* at layer 2 of the Open Systems Interconnection reference model." '435 patent, 11:18–19; 12:30–32.  Similarly, dependent claims 10 and 17 require that the "said high IPPC *is set* to a value *chosen*" and "said lower IPPC *is set* to a value *chosen*."[19] *Id.*, 11:20–30; 12:33–43.[20]  These method steps cannot be performed until the system of claims 8 and 13 respectively are actually used.  *See Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, No. 1:18-CV-760, 2019 WL 2745735, at *8 (E.D. Va. July 1, 2019), *aff'd*, 813 F. App'x 522 (Fed. Cir. 2020) (finding claim indefinite under *IPXL* where claim element "constitute[d] a method of use element").  As such, these claims are indefinite under *IPXL*.

*Claims 13 and 15*:  Dependent claim 15 requires the performance of actual steps—it recites that each creating and setting step "*are repeated*." '435 patent, 12:27–29 ("The computer network of claim 13, wherein said MSTI and VLAN member set *creating steps* and said *setting steps are*

---

[18] WSOU now disagrees that these claims can be grouped together as a single issue.  Br. 18. WSOU never previously raised this dispute during the parties' meet and confers, and **WSOU itself** treated these terms as one term in its Feb. 1, 2021 spreadsheet submitted to the Court.  *See* Ex. 14. Moreover, WSOU identifies no prejudice and should not be heard to complain now.

[19] In contrast, independent claim 8 requires a processing unit "for setting" the IPPC.

[20] Claims 11/18 depend from indefinite claims 10/17 and are thus indefinite for the same reason.

*repeated* for each of the MSTIs."). However, claim 15 depends on claim 13, but claim 13 is presented as a system claim. Yet, claim 15 treats certain limitations of system claim 13 as having method steps. It explicitly refers to claim 13's "creating" and "configuring" limitations as "***steps***." *Id*. If applicants' word choice is given effect, then this confirms that claim 13 contains method steps in a system claim. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."). Thus, claims 13 and 15 are indefinite under *IPXL*.

*Claim 14*: Claim 14 depends on independent claim 13, and is additionally indefinite because it requires that "each MSTI ***is created and configured*** using a Multiple Spanning Tree Protocol (MSTP) engine." Because the plain language of the claims requires the actual creation and configuration of the MSTIs (as opposed to mere capability), this claim is also indefinite.

*       *       *

WSOU states only that it "viewed each of the nine individual claims separately and disputes that there is any issue." Br. 18. WSOU then cites two cases that stand for the unremarkable proposition that system claims reciting capability are not indefinite under *IPXL*. *Id*. However, WSOU does not explain how those cases are relevant (because they are not) to the specific claim language recited in the claims of the '435 patent. For example, in *MasterMine Software*, the disputed claim language recited the "system's ***capability*** to receive and respond" to selections. *MasterMine Software, Inc. v. Microsoft Corporation*, 874 F.3d 1307, 1316 (Fed. Cir. 2017). In *Ultimate Pointer*, the disputed claim language "only indicate[d] that the associated structures have this ***capability*** (for example, the image sensor and processor in claim 1) and d[id] not require that any data be actually generated." *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 827 (Fed. Cir. 2016). Unlike either of those cases, the claims here cannot be properly described as system capabilities. Because it is unclear whether infringement occurs when one

32

creates the system or when the method steps are performed, these claims are indefinite under *IPXL*.

## IV.    DISPUTED TERMS FROM THE '129 PATENT

The '129 patent relates to detecting adverse network conditions based on the "rate of change" of usage of resources on a network node.  According to the patent, prior art systems could track usage of resources across multiple nodes in a network to perform "reactive monitoring."  *See* '129 patent, 1:14–26; 1:6–10; 1:27–42; 1:65–2:3.  "With reactive monitoring, the management station needs information about the network state in order to react (in real or semi-real time) to certain alarm conditions that may develop in the network."  *Id.*, 1:25–38.  One prior art method for tracking the network state was for nodes to send alerts to the management station when certain conditions are met, *e.g.*, when the instantaneous value of an attribute hits a threshold.  *Id.*, 1:5–58.

To improve upon such reactive monitors, the patent discloses that network nodes could instead generate alerts when the "rate of change" of the monitored attribute exceeds a threshold. *See id.*, 6:37–44; *see also id.*, Figs. 4–6.  By measuring the rate of change of usage in a resource in a node, the monitor can track how much the usage has increased or decreased in a given period of time, which permits detection of denial of service type attacks.  *Id.*, 3:44–49.

### A.    "rate of change" (claim 3)

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| Plain and ordinary meaning; not an instantaneous value measured at a fixed point in time | Plain and ordinary meaning |

The plain and ordinary meaning of "rate of change" to a POSA does not include instantaneous values measured at a fixed point in time, as applicants made explicitly clear to get this patent allowed.  WSOU seeks to interpret this term to include an instantaneous measurement of a usage parameter—*i.e.*, current in a device at a particular time—necessitating resolution of the

parties' dispute as to claim construction.[21]  *O2 Micro*, 521 F.3d at 1362.  And WSOU agrees that this claim construction dispute should be decided now.  *See* No. 6:20-cv-00479, Dkt. 52 at 1, 3–5 (stating whether "rate of change" could include an instantaneous value was "claim construction").

The intrinsic record is consistent in differentiating between a rate of change and an instantaneous value of a usage parameter.  Claim 3 itself recites "***monitoring usage of the resource in a node*** to determine when a ***rate of change of the usage*** exceeds a first predetermined threshold."  This language differentiates between a monitored parameter itself (*i.e.*, the usage of a resource) and the "rate of change" of that monitored parameter.  In other words, the claim requires monitoring the usage of a particular resource, and determining the rate at which that usage is changing.

The specification makes this differentiation unequivocally clear in explaining the difference between Figure 2 and Figure 4, reproduced below.  *See id.*, 5:28–40, 6:11–20.



---

[21] WSOU alleges that this limitation is met by a device that compares an instantaneous parameter—the current of a device—to a threshold at a particular point in time.  *See* Ex. 15 '129 Infringement Contentions at 5–6; *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1327 (Fed. Cir. 2006) ("Although the construction of the claim is independent of the device charged with infringement, it is convenient for the court to concentrate on those aspects of the claim whose relation to the accused device is in dispute." (quotation omitted)).

"FIG. 2 is a flow diagram of the resource utilization monitoring process performed at the nodes in FIG. 1, in a first embodiment of the invention which ***monitors the value*** of the resources used." *See* '129 patent, 2:54–57; *see also* 5:28–30, 5:41–49.

"FIG. 4 is a flow diagram of the resource utilization monitoring process performed at the nodes in FIG. 1, in a second embodiment of the invention which ***monitors the rate of change*** of the resources used;" *See* '129 patent, 2:62–65; *see also* 6:15–21, 6:37–44, 6:65–7:2.

On one hand, Figure 2 compares the ***instantaneous*** value of the monitored resource at a particular time $[X_i(t)]$ to a threshold in step 203. If the usage exceeds a threshold, the usage is sent to the network management station. *Id.*, 5:35–39. Figure 4, on the other hand, calculates how much the usage of the monitored resource changes between two times $[X_i(t)-X_i(t-1)]$ and comparing that ***difference*** to a threshold in step 403. That process requires knowing the value of the particular resource at two different times ($t$) and ($t$-1). If the difference between the usage at the first time and the usage at the second time is greater than amount λ, then the current usage is sent to the network management station. *Id.*, 6:10–28. Thus, the specification, like the claims, makes clear that the rate of change of a usage parameter cannot be merely the value of the usage parameter at an instantaneous point in time. The Court has construed terms to have plain and ordinary meaning with limitation when the specification was clear the terms were distinct. *See Digital Retail Apps, Inc. v. HEB, LP*, No. 6-19-00167-ADA, 2020 WL 376664, at *19 (W.D. Tex. Jan. 23, 2020) (holding "'wirelessly transmitting' cannot include photographing or otherwise scanning a code because the specification makes clear the two are distinct"); *see also Neodron, Ltd. v. Dell Technologies, Inc.* No. 1-19-00819-ADA, 2019 WL 9633629 (W.D. Tex. Dec. 16, 2019).

Finally, the prosecution history conclusively compels Defendants' construction because applicants expressly and unambiguously ***disavowed*** any claim scope that would include an instantaneous measurement of a usage parameter. During prosecution, applicants repeatedly distinguished between the claimed "rate of change" of a resource and the prior art's disclosures ("instantaneous value[s] measured at a fixed point in time" or "generic parameters that may be

35

measured or tested relative to predefined thresholds"). Ex. 16, (5/2/07 App. Arg.) at 7; Ex. 17,

(9/17/07 App. Arg.) at 8.  A most compelling passage is below:

> In other words, as taught in Mandal, the value is an instantaneous value, measured at a fixed point in time, that is compared against the threshold value.  An *instantaneous value measured at a fixed point in time*, as taught in Mandal, *is simply not a rate of change*, as claimed in Applicants' claim 1.  *A rate is clearly measured using a time interval, or some other interval by which rate may be measured*.  There is no time interval in Mandal.  Mandal is devoid of any teaching or suggestion of monitoring any rate.  As such, since Mandal fails to teach or suggest a rate of change, Mandal must also fail to teach or suggest a rate of change of usage of a resource, as claimed in Applicants' claim 1.

Ex. 16, (5/2/07 App. Arg.) at 11.  WSOU chose to omit the second emphasized sentence in its

brief, which undeniably states that a rate must be measured using an interval.  Br. 20–21.  If ever

there were a clear and unmistakable disavowal in prosecution, this is it.  This passage, which is

completely consistent with the specification, compels the conclusion that the term "rate of change"

cannot include an instantaneous value measured at a fixed point in time.  *See Tech. Properties Ltd.*

*LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1358 (Fed. Cir. 2017); *TMC Fuel Injection System,*

*LLC v. Ford Motor Company*, 682 F. App'x 895, 898 (Fed. Cir. 2017) (citing *Uship Intellectual*

*Properties, LLC v. U.S.*, 714 F.3d 1311, 1315 (Fed. Cir. 2013)).

In an effort to overcome the overwhelming intrinsic support for Defendants' construction,

WSOU makes two arguments, both of which fail.  *First*, WSOU argues (without support that) a

POSA would understand that "rate of change" *could* include instantaneous values or continuous

values for different time periods, analogizing to the speed of a car.  Br. 19–20.  That argument is

the *opposite* of what Applicants said to get the claims allowed, which is not permitted.  *See*

*Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).  In addition,

WSOU's analogy simply has nothing to do with the claim language, which recites not just any

"rate" but the "rate of change" *of the monitored usage of a resource*.  The claim requires

monitoring the usage parameter, and separately assessing the rate of change of that usage

parameter.  As discussed, the patent clearly distinguishes between Figure 4 and Figure 2 based on the requirement of Figure 4 (and the claims) to compare the usage ***at two different times***.  *See supra.*  If "speed" were one of the monitored resource usage variables, Figure 2 (which is not claimed) would measure the instantaneous value of speed (*i.e.*, the current speed), whereas Figure 4 (and claim 3) would measure the "rate of change" of speed (*i.e.*, how much the speed has changed since the last measurement).[22]

*Second*, WSOU argues that the ordinary meaning should apply because there is no lexicography or clear disavowal of claim scope.  Br. 20–23.[23]  That is incorrect.  At the outset, regardless of lexicography or clear disavowal, a POSA would have understood the ordinary meaning of "rate of change" of the usage of a resource to be distinct from a mere instantaneous value of usage at a fixed point in time.  But even if lexicography or disavowal were required— they are not—applicants' express distinction between a "rate of change" and an instantaneous value rises to the level of a clear disavowal.  *See Tech. Properties*, 849 F.3d at 1358 (affirming disclaimer where applicant argued during prosecution that prior art was "'specifically distinguished from the instant case'" (citation omitted)).  Here, applicants unambiguously stated that an instantaneous value at a fixed point in time "is simply not a rate of change" as recited in the claims, and that such a rate of change "is clearly measured using a time interval, or some other interval by which rate may be measured."  Ex. 16, (5/2/07 App. Arg.) at 11.  That distinction is the textbook example of disavowal, and it cannot be ignored, as WSOU seeks to do.  *See Southwall*, 54 F.3d 1570 at 1576; *Tech. Properties*, 849 F.3d 1349 at 1358.

In view of the clear meaning of "rate of change" throughout the intrinsic record, consistent

---

[22]  For example, if a car traveling at 50 mph at the first time and 60 mph at a second time, the ***difference in speed*** (10 mph) across those times reflects the "rate of change" of the parameter.

[23]  WSOU's "second" and "third" arguments are really a single argument regarding disavowal.  *Id.*

with its plain meaning, the Court should hold that the meaning of "rate of change" does not include instantaneous values of measured at a fixed point in time.

**B. "initiating a poll of resources in the nodes of the network by the management station in response to reporting from the node or a time interval being exceeded" (claim 3)**

| Defendants' Proposal | WSOU's Proposal |
|---|---|
| Both of these events trigger a poll | Plain and ordinary meaning |

The parties now appear to **agree** that the ordinary meaning of this phrase is that both of the listed events—(1) reporting from the node, and (2) a time interval being exceeded—would cause a poll of resources to be initiated and that the management station must be capable of both.[24] WSOU states that "[t]he syntax of the claim requires that the management station must be ***capable of initiating a poll in response to both*** 'reporting from the node' ***and*** 'a time interval being exceeded.'"  Br. 22.  Defendants agree and their construction makes that clear.[25]

The parties' agreement that the management station must be capable of initiating a poll in response to both events is consistent with the specification.  The patent states that both event reporting and periodic polling monitors were well known in the prior art.  *See* '129 patent, 1:43–63.  The patent purports to disclose "a technique for managing network elements significantly reduces the amount of monitoring related traffic by using a ***combination*** of aperiodic polling ***and*** asynchronous event reporting."  *Id.*, 2:16–19; *see also id.*, 2:33–43, 4:4–14 1:43–67, 4:31–41, 6:1–9, 6:37–44.  In particular, the patent discloses that if polling has not occurred due to a rate of change exceeding a threshold, then a poll is initiated once "a time interval is exceeded."  *See id.*,

---

[24]  Before briefing, Defendants repeatedly asked WSOU to state whether or not its "plain and ordinary meaning" meant that the management station needed to be only capable of "initiating a poll" for one of the two triggers or capable of independently responding to *both* of the triggers, and WSOU refused to state its position until its brief.  Ex. 18 (1/27/21 Email).

[25]  WSOU takes umbrage with Defendants' use of the word "trigger" rather than "initiate."  Br. 22. No distinction was meant between the words.  Defendants are amenable to replacing "trigger" with "initiate."

3:44–49, 6:37–44.  A POSA would thus understand that the management station of the claim must be capable of initiating a poll in response to both a reporting from the node and when a time interval is exceeded, as WSOU agrees the claims require.

In view of this apparent agreement in WSOU's brief, Defendants immediately reached out to propose an agreed construction of the "management station" portion of the disputed phrase to mean "a management station that is capable of initiating a poll in response to both reporting from the node and a time interval being exceeded." Ex. 19 (2/26/21 Email).  Despite this proposal being a direct quote from WSOU's brief, WSOU inexplicably ignored this request.  Rosenthal Decl., ¶ 20.

WSOU's principal argument against Defendants' construction is that while the management station must be capable of initiating a poll in either event, it needs to actually do so only in response to one of the events to practice the claimed method.  Br. 22.  Defendants agree, so this is a non-issue.  Defendants' construction is intended only to clarify the ambiguous claim language so that the jury understands that the management station must be capable of initiating a poll in both events—a position with which WSOU now agrees.  Thus, contrary to WSOU's assertions that Defendants' construction "erases limitations in the term" or "will also confuse a jury" (Br. 23), Defendants' construction (or its alternative compromise proposal) provides the jury clarity on the term.  *Abbott Labs.*, 544 F.3d at 1360.

Dated:  March 17, 2021

By:  */s/ Barry K. Shelton*

Barry K. Shelton
Texas State Bar No. 24055029
bshelton@sheltoncoburn.com
**SHELTON COBURN LLP**
311 RR 620, Suite 205
Austin, TX  78734-4775
Telephone:  512.263.2165
Facsimile:  512.263.2166

Benjamin Hershkowitz
bhershkowitz@gibsondunn.com
Brian A. Rosenthal
brosenthal@gibsondunn.com
Allen Kathir
akathir@gibsondunn.com
Kyanna Sabanoglu
ksabanoglu@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY  10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

Y. Ernest Hsin
ehsin@gibsondunn.com
Jaysen S. Chung
jschung@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street, Suite 3000
San Francisco, CA  94105-0921
Telephone:  415.393.8200
Facsimile:  415.393.8306

Ryan K. Iwahashi
riwahashi@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone:  650.849.5300
Facsimile:  650.849.5333

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on March 17, 2021, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(b)(1).

*/s/ Barry K. Shelton*
Barry K. Shelton
